02-10-147-CV













 



 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO. 02-10-00147-CV 

 

 


 
 
 IN THE INTEREST OF C.C., A CHILD 
 
 
  
 
 


 

------------

 

FROM THE
323rd District Court OF Tarrant
COUNTY

------------

MEMORANDUM OPINION[1]

----------

I.  Introduction

          In one issue, Appellant Mother appeals
the termination of her parental rights to C.C., complaining that the evidence
is factually insufficient to support the trial court’s best interest finding.  We affirm. 

II.  Factual and
Procedural History

          Two
Child Protective Services (CPS) employees and Mother testified at the
termination trial in April 2010.  Mother
was incarcerated in state jail at the time of the trial, and her earliest release
date was half a year away, in October 2010.  She was also incarcerated at the time she gave
birth to C.C., the youngest of her five children. 

Mother
testified about her other children[2]:  Jeremy, age twenty-two, lived with Mother
until he was around age fourteen or fifteen.  Mother testified that she wrote to Jeremy once
a week while he was incarcerated in the Hood County Jail. Darren, age twenty,
lived with Mother until he was around twelve years old.  He has also been incarcerated.  Damon, age fifteen, lived with Mother until
he was three years old.  Jeffrey, born in
2005, was removed from Mother before his first birthday and lives with one of
Mother’s sisters.  C.C. has never lived
with Mother. 

Mother’s
criminal convictions were admitted through the testimony of Christy Shidal, the CPS investigator, set out as follows:

·       
On
December 17, 2001, Mother was convicted of third degree felony injury to a
child.  After pleading guilty, she
received two years’ confinement as punishment.  The indictment alleged that Mother struck,
scratched, and bit Jeremy, who was younger than age fifteen at the time.[3]


 

·       
On
May 7, 2001, Mother was convicted of misdemeanor assault causing bodily injury
to a family member after pleading guilty in exchange for six days in jail. 

 

·       
On
August 21, 2006, Mother was convicted of misdemeanor assault causing bodily injury
to a family member after pleading guilty in exchange for forty-five days in
jail. 

 

·       
On
January 30, 2008, Mother was convicted in two cases of state jail felony
fraudulent use or possession of identifying information after pleading guilty
in exchange for 200 days’ jail time in each case, to be served concurrently. 

 

·       
On
January 21, 2010, Mother made an open plea of guilty to a state jail felony
possession of a controlled substance (methamphetamine) charge and made a plea
in bar of an unadjudicated 2008 assault causing
bodily injury of a family member charge.  She received three years’ confinement as
punishment.

 

Some
of Mother’s CPS history involving her other children was admitted through the
testimony of her CPS caseworker Carressa Cherry:

·       
In
May 1999, CPS ruled “reason to believe” negligent supervision of Damon. 

 

·       
In
March 2001, CPS ruled “reason to believe” physical abuse of Jeremy and Darren. 

 

·       
In
April 2007, CPS ruled “reason to believe” negligent supervision of Jeffrey. 

 

Mother
was nine months’ pregnant with C.C. when she was arrested for possession of
methamphetamine, and she admitted that she used methamphetamine throughout her
pregnancy with C.C.  Mother started using
methamphetamine twelve years before C.C.’s birth, “when they took [her] first
child,” and has been addicted ever since.  The longest period of time that she has been
off of drugs is two years, while incarcerated. 
Mother also testified about her abusive relationship with Darren’s
father, with whom she stayed with for “umpteen years.” 

          Cherry testified that Mother did not
complete her service plan, but Mother did complete some services available to
her in prison, such as Community Addiction Treatment Services (CATS) and
Alcoholics Anonymous, in addition to bible study.  Mother testified that she never received the
revised service plan, which Cherry claimed she sent regarding services Mother
could receive while incarcerated, and that she had never taken a parenting
class or an anger management class.  Mother
asserted that during her most recent stay in jail, she
had changed, stating, “I’ve taken a year to change my attitude and my ways, my
way of thinking.  I went to every
available class that there is.  I’m a
better person from who I was to who I am.”

Mother
was diagnosed by Tarrant County MHMR with severe depression and methamphetamine
addiction and takes medication for her depression.  She disagreed that she had tried to interfere
with a relative’s permanent managing conservatorship of Jeffrey, her second
youngest child—one of the reasons Cherry gave for the Department of Family and
Protective Services (DFPS) seeking to terminate Mother’s parental rights and to
seek adoption by relatives in C.C.’s case. 

Mother
testified that upon her release from prison, she planned to continue services
to help treat her drug addiction, and until she could properly provide for
C.C., she wanted him to remain with her sister.  She stated that she had no employment
opportunities lined up for after her release from jail and that, from age
eighteen to thirty-eight, the longest period of time that she has ever held a
job was two to three years.  Although
under a court order to pay child support, she has never done so.  She testified that she would probably move in
with Jeffrey’s father when released from jail. 

Cherry
testified that Mother’s sister and her husband wanted to adopt C.C., and no one
disputed that, in Mother’s words, it was best for C.C. “to be where he’s at.”  Mother stated, “I know that my sister has a
loving and stable home,” but she asked the trial court to make her sister
C.C.’s permanent managing conservator instead of terminating her parental
rights to him.  Cherry testified that
Mother’s parental rights to C.C. should be terminated because 

[a]t this time,
[Mother] is not able to parent [C.C.]  I
have not been able to see first-hand her interaction or parenting skills with
him because she has been incarcerated the length of this case; however,
[Mother’s] previous history indicates that she has difficulty with violence,
criminal involvement, and drug abuse.

 

          [Mother] has other children she was
unable to raise due to her drug abuse and unsafe environment.

 

          [Mother] has not been able to provide
a safe environment for her other children. 
There has been a pattern of behavior that’s spanned at least 12 years,
including numerous criminal convictions and CPS history.

 

She
added that Mother had other children that are being raised by relatives because
of her inability to provide for them and to protect them,[4]
and Mother’s history of violence and inability to raise her other children
indicated that she would also be unable to raise C.C. 

C.C.
was placed in foster care after his birth on June 5, 2009, and the trial court
appointed Mother’s sister and her husband as C.C.’s temporary possessory
conservators on December 3, 2009, after CPS performed a home study.  Cherry described C.C. as a very well-adjusted,
happy baby. 

Cherry
described the parenting skills of Mother’s sister and husband, stated that they
have created a “very loving, stable home” for him, and added,

They’ve lived in the
same residence for over 19 years.  They
have a very stable, loving relationship with one another as well as with
[C.C.], and their older son, I’ve watched this interaction on numerous
occasions.  They have maintained
continued contact with [C.C.], even before he was placed in their home.  They visited him and maintained that contact
with him.  They’ve been probably the most
stable adults in his life since his birth, because they were visiting even
beforehand, before he was placed in their home. 
The home is very well-maintained, it’s a quiet neighborhood, they do have a security system.  There are no safety hazards in the home. 

 

She
described Mother’s sister and husband as employed and with the financial means
to provide for C.C.  Cherry stated that
they told her that they would not hesitate to call the police or CPS if anyone,
including a family member, were to threaten C.C.’s well-being and that they have
called the police on Mother before with regard to protecting Mother’s other
children. 

The trial court found by clear and convincing
evidence that Mother knowingly placed or knowingly allowed C.C. to remain in
conditions or surroundings that endangered his physical or emotional well-being,
that she engaged in conduct or knowingly placed C.C. with persons who engaged in
conduct that endangered his physical or emotional well-being, and that
termination of Mother’s parental rights was in C.C.’s best interest.[5]  See
Tex. Fam. Code Ann. § 161.001(1), (2) (Vernon Supp. 2010).  This appeal followed.

III. 
Factual Sufficiency

          In
her sole issue, Mother complains that the evidence is factually insufficient to
support the trial court’s best interest finding.  She does not appeal the trial court’s endangerment
finding.

A.  Standard of Review

          A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer,
455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115
S.W.3d 534, 547 (Tex. 2003).  “While parental rights are of constitutional
magnitude, they are not absolute.  Just
as it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not
just to limit parental rights but to erase them permanently—to divest the
parent and child of all legal rights, privileges, duties, and powers normally
existing between them, except for the child’s right to inherit.  Tex. Fam. Code Ann. §
161.206(b) (Vernon 2008); Holick v. Smith,
685 S.W.2d 18, 20 (Tex. 1985).  We
strictly scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20–21; In re M.C.T.,
250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

          In proceedings to terminate the
parent-child relationship brought under section 161.001 of the family code, the
petitioner must establish one ground listed under subsection (1) of the statute
and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. §
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

          Termination decisions must be supported
by clear and convincing evidence.  Tex. Fam. Code Ann. § 161.001, § 161.206(a) (Vernon 2008).  Evidence is clear and convincing if it “will
produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Id.
§ 101.007 (Vernon 2008).  Due
process demands this heightened standard because termination results in
permanent, irrevocable changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex.
2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder’s findings and not supplant the
judgment with our own.  In re H.R.M., 209 S.W.3d
105, 108 (Tex. 2006).  Here, we
must determine whether, on the entire record, a factfinder
could reasonably form a firm conviction or belief that termination of the
parent-child relationship would be in the best interest of the child.  Tex. Fam. Code Ann. §
161.001(2); C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could
not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.  

B.  Best Interest

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex.
2006).  Prompt and permanent
placement of the child in a safe environment is also presumed to be in the
child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008).  In evaluating the parent’s willingness and
ability to provide the child with a safe environment, we consider the factors
set out in family code section 263.307(b). 
Id. §
263.307(b) (Vernon 2008).  Other,
nonexclusive factors that the trier of fact in a
termination case may use in determining the best interest of the child include:

(A)     the desires of the
child;

 

(B)     the emotional and
physical needs of the child now and in the future;

 

(C)     the emotional and
physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody; 

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)     the plans for the
child by these individuals or by the agency seeking custody;

 

(G)     the stability of
the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one; and

 

(I)          
any excuse for the acts or omissions of the
parent.

 

Holley v. Adams,
544 S.W.2d 367, 371–72 (Tex. 1976).

          These factors are not exhaustive; some
listed factors may be inapplicable to some cases; other factors not on the list
may also be considered when appropriate. 
C.H., 89
S.W.3d at 27.  Furthermore,
undisputed evidence of just one factor may be sufficient in a particular case
to support a finding that termination is in the best interest of the
child.  Id.  On the other hand, the
presence of scant evidence relevant to each factor will not support such a
finding.  Id.

C. 
Analysis

          Mother argues that the evidence is
factually insufficient to support the trial court’s best interest finding
because although there was evidence of her past poor decision making and
criminal conduct, there was insufficient evidence of each Holley factor for the trial court to form a firm belief or
conviction that termination was in C.C.’s best interest.  Specifically, she complains that there was
little or no evidence to show (1) that C.C. has any special physical or
emotional needs beyond those of a normal child; (2) that DFPS offered little
evidence regarding whether Mother could meet C.C.’s physical and emotional
needs in the future; (3) that DFPS offered little evidence regarding whether
Mother would endanger C.C. in the future; (4) that no clear and convincing
evidence of her ability or inability to parent C.C. exists; and (5) that there
was no evidence presented of programs or financial assistance available to aid
Mother in serving C.C.’s best interest in the future. 

Mother
relies on In re W.C., 98 S.W.3d 753,
758 (Tex. App.—Fort Worth 2003, no pet.), and In re D.T., 34 S.W.3d 625, 642 (Tex. App.—Fort Worth 2000, pet.
denied), to support her factual insufficiency argument.  Both cases are inapposite.

In W.C., DFPS removed the children from
their mother because she failed to protect them from their father, who resumed
his physical and sexual abuse of the children after she allowed him back into
the family home upon his release from jail on a conviction for injury to a child.  98 S.W.3d at 755–56.  The record reflected that the mother was
devastated when she learned about the sexual abuse and threw away
everything—including furniture—that would remind the children of their father
and the abuse they suffered at his hands. 
Id. at
761–62, 764.  

We
held that the evidence on the best interest finding was factually insufficient
because, among other things, the mother fully complied with her service plan in
all respects except for her court-ordered child support payments, she visited
her children regularly and used proper discipline, she maintained suitable employment,
she lived in her own apartment deemed by DFPS as a “safe living environment,”
and she “made significant progress in alleviating the causes for the children’s
removal from her home.”  Id. at 765.  And we stated that while there was evidence of
past poor parenting skills, poor decision making, and inadequate protection of
the children, because the mother did everything she had been asked to do and
because no significant event occurred between the time DFPS planned to return
the children to her and the time of the termination trial, the evidence to
support the best interest finding was factually insufficient.  Id.
at 766 (“We conclude that this case is one where appellant’s offensive behavior
is not egregious enough, on its own, to warrant a finding that termination is
in the children’s best interest.”).  

Likewise,
in D.T., DFPS’s predecessor agency
conceded that the mother complied in all possible respects with her service
plan, and the record reflected that the mother’s overall concern was ensuring
her child’s safety.  34
S.W.3d at 640.  That is, the
mother herself contacted the agency to temporarily place the child after she
was arrested, and she attempted to comply as fully as possible with the goals
and objectives the agency required to facilitate reunification.  Id.  While in prison, she wrote letters to inquire
about her child and to request photographs and visits, and she participated in
classes and counseling sessions. Id.  Additionally, the underlying offense for which
she went to prison was writing bad checks, not using or possessing illegal
drugs.  Id. at 637.

          Here, Mother openly admitted to the
trial court that her sister’s home was the best place for C.C.  From this admission, and all of the other
evidence presented at trial, the trial court could have concluded that
terminating Mother’s parental rights to C.C. so that Mother’s sister could
adopt him would be in C.C.’s best interests. 
That is, Mother’s own criminal history includes a conviction for injury
to a child and several convictions for assault on family members, as well as
drug use, unlike either parent in W.C.
or D.T.  See In
re D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (“While
Appellant’s history, admissions, and conduct relating to drug abuse, and her
inability to maintain a lifestyle free from arrests and incarcerations[,]
support the jury’s endangerment finding, this evidence is also relevant to a
best interest determination.”).  Further,
her history of abusive relationships shows that she has been both abuser and
abused and, contrary to Mother’s assertion that no clear and convincing
evidence of her inability to parent exists, her CPS history and her two oldest
children’s incarcerations seem to demonstrate that she has already failed twice
to successfully raise children to become law-abiding adults.  Finally, from her inability to explain how
she would take care of herself, let alone a very young child, once released
from jail, the trial court could have reasonably formed a firm conviction or
belief that termination of the parent-child relationship would be in C.C.’s best
interest.[6]  See
Tex. Fam. Code Ann. § 161.001(2); C.H.,
89 S.W.3d at 28.  We overrule Mother’s
sole issue.

IV.  Conclusion

          Having overruled Mother’s sole issue,
we affirm the trial court’s judgment.

 

PER CURIAM

 

PANEL:  MCCOY, J.; LIVINGSTON, C.J., and DAUPHINOT,
J. 

 

DELIVERED:  December 23, 2010











[1]See Tex. R. App. P. 47.4.





[2]We use pseudonyms to
protect the children’s identities.

 





[3]Mother testified that
she was high on drugs at the time and did not recall biting or fighting him. 





[4]Mother testified that
she retained the parental rights to all of her other children. 





[5]The trial court
terminated C.C.’s father’s parental rights after he executed a voluntary
affidavit of relinquishment. 





[6]DFPS did not have to
present evidence that C.C. had any special needs or that there could be
programs or financial assistance available to Mother in the future for the
evidence, based on the entire record in this case, to be factually
sufficient.  See C.H., 89 S.W.3d at 27 (noting that
not all Holley factors may be
applicable in any given case).